UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

LA DOLCE VITA FINE DINING COMPANY
LIMITED and LA DOLCE VITA FINE DINING
GROUP HOLDINGS LIMITED,

        Petitioners,

   - against -

ZHANG LAN, GRAND LAN HOLDINGS GROUP
(BVI) LIMITED, QIAO JIANG LAN DEVELOPMENT
LIMITED f/k/a SOUTH BEAUTY DEVELOPMENT
LIMITED and METRO JOY INTERNATIONAL LLC,

        Respondents.

---

Case No. 20 Misc. 200 (ALC)

PETITIONERS' MEMORANDUM OF LAW IN
SUPPORT OF THEIR MOTION UNDER NEW YORK
CPLR § 6211(b), INCORPORATED BY FED. R. CIV. P. 64,
TO CONFIRM THE COURT'S ORDER OF ATTACHMENT

KATSKY KORINS
605 Third Avenue
New York, New York 10158
(212) 953-6000
*Attorneys for Petitioners La Dolce Vita Fine
Dining Company Limited and La Dolce Vita
Fine Dining Group Holdings Limited*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................1

THE FACTS ..................................................................................................................5

    A.    The Parties and Jurisdiction ..................................................................6

    B.    The Arbitrations ....................................................................................6

        1.    The Salient Facts Underlying Petitioners' Claims
Against Respondents in the Arbitrations ........................................6

            (i)    Petitioners' Acquisition of Respondents' Controlling Shares
in the Companies Owning and Operating the South Beauty
Chain of Restaurants in China ........................................7

            (ii)    Petitioners' Post-Acquisition Realization that South Beauty
Was Significantly Underperforming Expectations ........................6

        2.    Petitioners' Commencement of the Arbitrations and the Panel's
Eventual Issuance of the Arbitral Awards ...................................8

        3.    The Current Status of the Arbitrations ........................................8

    C.    The Facts Underlying the Need for the Attachment Order:  Zhang's History
of Secreting Assets, and the Attachment of the Apartment as One
of the Few Known Means of Ensuring that the Arbitral Awards Are Not
Rendered Ineffectual ...........................................................................9

        1.    Zhang's History of Secreting Assets to Evade Respondents'
All But Certain Eventual Obligation to Pay the Arbitral Awards .............10

        2.    Zhang's Purchase of the Apartment at the Baccarat Hotel &
Residences in Metro Joy's Name, and Her Ownership Of or
Control Over Metro Joy ..............................................................15

ARGUMENT ..................................................................................................................18

I.    PETITIONERS ARE ENTITLED TO AN ORDER UNDER CPLR § 6212(b)
CONFIRMING THE ATTACHMENT ORDER, HAVING MET THE
REQUIREMENTS FOR ATTACHMENT UNDER CPLR §§ 6201 AND 7502(c) ........18

    A.    The Legal Standards Governing a Petition for Attachment ..................18

    B.    Petitioners Satisfy Each of the Requisite Elements
of an Order of Attachment in Aid of Arbitration ..................................20

   1.  The Pending Arbitrations Each Constitute a "Cause of Action" ...............20

   2.  Petitioners Are Likely to Succeed on the Merits in the
     Arbitrations, Having Already Obtained the Arbitral Awards ...................20

   3.  Zhang's History of Secreting Her and Her Companies' Assets
     Makes It Highly Likely that the Arbitral Awards Will Be Rendered
     All the More Ineffectual Without an Attachment of the Apartment .........21

   4.  The Amount Awarded in Petitioners' Favor in the Arbitral
     Awards Exceeds Respondents' Dismissed Counterclaims .......................23

  C.  The Apartment Is Properly Subject to Attachment ................................................23

II.  PETITIONERS MEET THE REQUIREMENTS OF CPLR §§ 6211(b)
  AND 6223(b) FOR CONFIRMATION OF THE ATTACHMENT ORDER ..................24

CONCLUSION.......................................................................................................................24

<u>TABLE OF AUTHORITIES</u>

Page(s)

<u>Cases</u>

*Capital Ventures Int'l v. Rep. of Arg.*, 443 F.3d 214 (2d Cir. 2006) ...............................21

*Considar, Inc. v. Redi Corp. Establishment,* 238 A.D.2d 111, 655 N.Y.S.2d 40
    (1st Dep't 1997) ................................................................................................................20

*County Natwest Sec. Corp. USA v. Jesup, Josephthal & Co.*, 180 A.D.2d 468
    (1st Dep't 1992) ...........................................................................................................21, 22

*Drexel Burnham Lambert v. Ruebsamen*, 139 A.D.2d 323 (1st Dep't 1988),
    *leave to appeal denied*, 73 N.Y.2d 703 (1988) ...............................................................21

*Habitations Ltd. v. BKL Realty Sales Corp.*, 160 A.D.2d 423 (1st Dep't 1990) ...........22

*In re Thornton & Naumes LLP*, 36 A.D.3d 1119 (3d Dep't 2007)...................................20

*JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.,*
    306 F.Supp.2d 482 (S.D.N.Y.2004) ................................................................................20

*Kadish v. First Midwest Sec., Inc.*, 115 A.D.3d 445 (1st Dep't 2014) ...........................19

*Mermaid Marine, Ltd. v. Maritime Capital Mgmt. Partners, Ltd.*,
    147 A.D.3d 498 (1st Dep't 2017) ....................................................................................19

*Mischon de Reya New York LLP v. Grail Semiconductor, Inc.*,
    No. 11 Civ. 04971 (RJH), 2011 WL 6957595 (S.D.N.Y. Dec. 28, 2011)......................... passim

*Moquinon, Ltd. v. Gliklad*, No. 650366/2017, 55 Misc.3d 1212(A),
    2017 N.Y. Slip Op. 50548(U) (Sup. Ct. N.Y. Co. Apr. 6, 2017) ...............................19, 22

*Plenty v. Randell*, No. 95 Civ. 5850, 1995 WL 694661
    (S.D.N.Y. Nov. 22, 1995).................................................................................................22

*SiVault Sys., Inc. v. Wondernet, Ltd.*, No. 05 Civ. 0890 (RWS),
    2005 WL 681457 (S.D.N.Y. Mar. 28, 2005)..........................................................18, 19, 22

*Sojitz Corp. v. Prithvi Info. Solutions Ltd.*, 26 Misc.3d 670
    (Sup. Ct. N.Y. Co. 2009) ............................................................................................19, 22

<u>Statutes</u>

28 U.S.C. § 1331 ...................................................................................................................6

28 U.S.C. § 1332(a)(2)..........................................................................................................6

28 U.S.C. § 1391(b)(2) ..........................................................................................................6

9 U.S.C. § 203........................................................................................................................6

CPLR § 5201(b)....................................................................................................................23

CPLR § 6201....................................................................................................................18, 19

CPLR § 6202.........................................................................................................................23

CPLR § 6211(b) ..................................................................................................................24

CPLR § 6223 ......................................................................................................................24

CPLR § 6301 ......................................................................................................................19

CPLR § 7502(a)(ii) ..............................................................................................................6

Rules

Fed. R. Civ. P. 64 ...............................................................................................................18

Petitioners La Dolce Vita Fine Dining Company Limited ("LDV Company") and La Dolce Vita Fine Dining Group Holdings Limited ("LDV Holdings," and collectively, "Petitioners") submit this memorandum of law in support of their motion under New York CPLR § 6211(b), incorporated by Fed. R. Civ. P. 64, to confirm the order of attachment issued by the Court on May 8, 20202 (the "Attachment Order" or the "Order," Ex. 1).[1]

PRELIMINARY STATEMENT

The Attachment Order granted Petitioners' petition, made on April 28, 2020 on an *ex parte* basis (the "Petition," Ex. 2), for the attachment under New York CPLR § 7502(c) and Article 62, incorporated by Rule 64, of a condominium apartment in midtown Manhattan owned or controlled by one or more of respondents Zhang Lan ("Zhang"), Grand Lan Holdings Group (BVI) Limited ("Grand Lan Holdings"), Qiao Jiang Lan Development Limited f/k/a South Beauty Development Limited ("QJL Development," and together with Zhang and Grand Lan Holdings, the "Arbitral Respondents"), and Metro Joy International LLC ("Metro Joy," and together with the Arbitral Respondents, "Respondents").  Petitioners sought the Attachment Order, and now seek its confirmation, in aid of two related arbitrations pending before the China International Economic and Trade Arbitration Commission ("CIETAC") in Beijing (the "Arbitrations"). Petitioners commenced the Arbitrations in 2015 against the Arbitral Respondents to recover damages they incurred due to the Arbitral Respondents' misrepresentations in connection with two separate sale and purchase agreements that the parties entered into in December 2013.

On April 28, 2019, the arbitral panel in the Arbitrations issued its partial disposition in each Arbitration as to liability, awarding Petitioners damages as against the Arbitral Respondents

---

[1]       References to "Ex. __" are to the exhibits to the accompanying declaration dated May 19, 2020 of Steven B. Feigenbaum, Petitioners' lead counsel ("Feigenbaum Declaration II").

in the combined amount of $142,463,666.28, plus interest (the "Arbitral Awards").  The arbitral

panel deferred for separate resolution the still-pending issue of the amount and allocation of costs.

The Arbitral Respondents later challenged the panel's rulings, and that challenge, opposed by

Petitioners, is also pending.  Petitioners anticipate that the challenge of the Arbitral Awards, made

solely on procedural grounds, will be rejected, and that the Arbitral Awards will be upheld.

This is the second application that Petitioners have recently filed in this Court to attach the

Arbitral Respondents' known assets in New York.  On November 21, 2019, Petitioners obtained

an *ex parte* attachment order (Ex. 9) as to certain artworks, owned or controlled by the Arbitral

Respondents, that are being kept by the auction house Christie's New York ("Christie's").  That

proceeding, *La Dolce Vita Fine Dining Company Limited et al. v. Zhang Lan et al.*, No. 19-mc-

536 (ALC) (the "Christie's Attachment Proceeding"), is still pending before this Court, and the

attachment order securing the artworks at Christie's remains in place.  When they commenced the

Christie's Attachment Proceeding, Petitioners were unaware that the main asset subject to the

Attachment Order here – a three-bedroom high-rise apartment, number 39A, located at 20 West

53rd Street in New York City (the "Apartment") – is held in the name of Metro Joy, an entity

created, owned and controlled by Zhang.  That is why Petitioners brought this separate

proceeding to attach the Apartment in aid of their eventual enforcement of the Arbitral Awards.

Petitioners began the process of obtaining the Attachment Order by first requesting, on

April 28, 2020, leave to file the Petition and its supporting papers under seal and maintain them

under seal until such time as the Attachment Order was in effect.  By Order dated April 29, 2020

(the "Sealing Order," Ex. 3), Judge Castel, then sitting in Part I, granted Petitioners' request.

That same day, the Petition and its supporting papers were presented to Judge Caproni, to whom

the Petition had been assigned, who then transferred the Petition to Judge Carter because it is

related to the Christie's Attachment Proceeding.  On May 8, 2020, this Court issued the

Attachment Order – which states that Petitioners have "met the requirements for attachment under New York law" (Ex. 1 at p. 2) – and Petitioners thereafter served the Attachment Order, the Sealing Order, the Petition, and all of the other papers on which the Attachment Order was based (the "Attachment Papers") on Respondents by the means set forth in the Order (*see* Ex. 1 at p. 3). Petitioners filed the affidavits of service (Ex. 4) under seal on May 14, 2020.[2]

Petitioners now move on notice to Respondents, within the requisite five days of completing service of the Attachment Papers, for an order under CPLR § 6211(b) confirming the Attachment Order.  The legal and factual bases on which Petitioners seek confirmation of the Attachment Order are the same as those on which the Petition was based and boil down to one overarching rationale:  the need to ensure that the Arbitral Awards are not rendered ineffectual by allowing Zhang or her agents authorized to do business on Metro Joy's behalf – including her son, Wang Xiaofei – to sell or otherwise transfer title to the Apartment and its contents and then hide the sale proceeds.  That need arises from Zhang's history of secreting and dissipating her and her companies' assets that would otherwise be available to help satisfy the Arbitral Awards, and the Apartment, in fact, was already being actively marketed before it was attached.

Indeed, as detailed in the Petition (Ex. 2), Zhang has already been sentenced to prison by a Hong Kong court, for contempt of court, for failing to disclose her assets as part of a Mareva injunction freezing all her assets worldwide.  Zhang's attempts to render her and her companies judgment proof – and the Arbitral Awards ineffectual – underlie the basis for the provisional relief granted in the Attachment Order.  Metro Joy is one of the products of Zhang's efforts to secrete her and her companies' assets.  Zhang established Metro Joy and a related entity named

---

[2]        Once the affidavits of service had been filed, as set forth in the Attachment Order, all documents previously filed in this proceeding could be unsealed.  On May 19, the Court instructed the Clerk's office to unseal the proceeding, allowing this motion and all subsequent filings to be publicly filed on the Court's ECF system.

Metro Joy Management LLC ("Metro Joy Management") in March 2014, following her creation of at least three off-shore shell companies in January 2014, including one named Metro Joy International Limited ("MJI Limited").  Zhang, through Metro Joy, purchased the Apartment in December 2014 for $10.25 million, and it remains among the few assets of which Petitioners are aware that can help satisfy a meaningful part of the Arbitral Awards.

As shown in Point I below, and as the Attachment Order reflects, Petitioners readily meet the requirements under CPLR § 7502(c) and Article 62 for obtaining an order of attachment as to the Apartment and any of its contents owned or controlled by Respondents.  First, the Arbitrations serve to satisfy the "cause of action" requirement under CPLR 6212(a) and § 7502(c).  Second, the Arbitral Awards, having already been issued in Petitioners' favor, by themselves establish that Petitioners have a likelihood of success on the merits in the Arbitrations.  That the Arbitral Respondents have challenged the Awards on procedural grounds – an exceedingly uphill battle – does not affect that showing.  Third, the account of Zhang's history of secreting assets, as discussed in the Petition, confirms that unless the Apartment remains attached, it will be put back on the market and sold, the sale proceeds will be hidden, and the Arbitral Awards will be rendered that much more ineffectual.  And fourth, the Arbitral Respondents have no counterclaims in the Arbitrations – they were all dismissed – that could exceed the $142,463,666.28 already awarded to Petitioners.

Finally, as discussed in Point II below, Petitioners' establishment of their right to the Attachment Order also shows why Petitioners meet the requirements under CPLR §§ 6211(b) and 6223(b) for confirming the Order.  Thus, Petitioners have established (i) the grounds for the attachment of the Apartment and its contents, (ii) the need for continuing the attachment, and (iii) the probability that Petitioners will succeed on the merits in the Arbitrations.  Petitioners are accordingly entitled to an order under CPLR § 6211(b) confirming the Attachment Order.

4

## THE FACTS

The facts in support of this motion to confirm the Attachment Order are the same as those that support the Order itself and are set forth both in the Petition and in the April 28, 2020 declaration of Mr. Feigenbaum ("Feigenbaum Declaration I," Ex. 5) submitted in support of the Petition.  Insofar as CPLR 6212(a) requires that a motion to confirm an attachment order, like the initial motion itself, be supported by affidavit and other written evidence as may be submitted, the Feigenbaum Declaration I, and the exhibits thereto, meet that requirement.

The facts set forth in the Petition and the Feigenbaum Declaration I are derived mainly from three sources:  (i) pertinent documents regarding the Arbitrations and simultaneous injunction proceedings in Hong Kong and Singapore to probe and freeze the Arbitral Respondents' assets, (ii) an affidavit dated March 29, 2017 of Cosimo Borrelli ("Borrelli Affidavit" or "Borrelli Aff.," Ex. 3), a Managing Director of Borrelli Walsh Limited who serves as one of the two receivers and managers for LDV Company, and (iii) publicly available documents relating to the Apartment and Metro Joy's link to Zhang.  Mr. Borrelli submitted his affidavit in Petitioners' prior contempt proceeding in Hong Kong against Zhang for having breached injunction orders (i) enjoining her from transferring or hiding assets while the Arbitrations were pending, and (ii) requiring Zhang to file and serve affidavits setting out her assets, held anywhere in the world, valued at HKD 500,000 (approximately $64,000) or more.

The facts fall broadly into two main categories:

(i)     The parties' transactions that gave rise to the Arbitrations, Petitioners' commencement of the Arbitrations, the panel's partial rulings in Petitioners' favor, and the current status of the Arbitrations.  Due to space constraints, we summarize those facts here rather than repeat them in full.

(ii)     The facts underlying Petitioners' need for and right to an attachment order:  (a) the evidence of Zhang's prior secreting of assets – acts that give rise to the strong probability that she created Metro Joy, among other related shell companies, to conceal the Apartment and shield it from execution, and that she will continue to secrete her other assets so as to render the Arbitral Awards ineffectual; (b) the evidence regarding the Apartment, which is among the few known assets still available to satisfy a meaningful part of the Arbitral Awards, and which was being actively marketed until the Attachment Order was entered, and which will almost certainly be placed back on the market and sold if the Attachment Order is not confirmed; and (c) the evidence available to date establishing that Zhang owns or controls Metro Joy.

A.     The Parties and Jurisdiction

All of the parties to this proceeding are described in the Petition (Ex. 2 at ¶¶9-14).  Due to page limitations, we refer the Court to those descriptions rather than repeat them here.

This Court has subject matter jurisdiction under 28 U.S.C. § 1331, because this action arises under the laws of the United States, and specifically Chapter Two of the Federal Arbitration Act (Convention on the Recognition and Enforcement of Foreign Arbitral Awards) (*see* 9 U.S.C. § 203); and under 28 U.S.C. § 1332(a)(2), because there is diversity among the parties and the amount in controversy exceeds $75,000.  Venue is appropriate under CPLR § 7502(a)(ii) and 28 U.S.C. § 1391(b)(2), since the property at issue is situated in this district.

B.     The Arbitrations

1.     The Salient Facts Underlying Petitioners' Claims
         Against the Arbitral Respondents in the Arbitrations

The facts underlying Petitioners' claims in the Arbitrations are set forth in the Arbitral Awards (Exs. 6 and 7) and summarized in the Feigenbaum Declaration I (Ex. 5 at ¶¶11-24).

> (i)   Petitioners' Acquisition of the Arbitral Respondents'
>       Controlling Shares in the Companies Owning and Operating
>       the South Beauty Chain of Restaurants in China

In December 2013, the Petitioners acquired a majority stake in South Beauty Investment Company Limited ("South Beauty"), which, in turn, owned a chain of restaurants in China known by the name "South Beauty."  The acquisition was completed in two stages:  (a) On December 9, 2013, LDV Company entered into a sale and purchase agreement ("SPA") that provided for LDV Company to acquire 100% of the shares in South Beauty and for (i) 27.3% of the shares in La Dolce Vita Fine Dining Holdings (i.e., the parent company of LDV Company and South Beauty) to be issued to the Grand Lan Holdings, and (ii) a total of 3.5% of the shares in La Dolce Vita Fine Dining Holdings to be issued to QJL Development; and (b) on December 13, 2013, LDV Holdings entered into a further SPA with Zhang and Grand Lan Holdings, under which LDV Holdings acquired nearly half of the shares of La Dolce Vita Fine Dining Holdings that had previously been issued to Grand Lan Holdings, such that Grand Lan Holdings ultimately retained a 13.8% interest in La Dolce Vita Fine Dining Holdings and in its subsidiary South Beauty restaurants in China.  (The two SPAs are referred to collectively as the "Acquisition.")  In all, Petitioners paid Zhang and her companies $286,850,887 under the SPAs.  After the Acquisition, South Beauty and its chain of restaurants were 82.7% owned and controlled by Petitioners.

> (ii)   Petitioners' Post-Acquisition Realization that South
>        Beauty Was Significantly Underperforming Expectations

In February 2014, shortly after the Acquisition, Zhang informed Petitioners that South Beauty's financial performance had significantly worsened after the Acquisition, as reflected in South Beauty's financial results for the second quarter of 2014.  Petitioners then commenced their own investigation of South Beauty, through which they learned by early 2015 that South Beauty's transaction sales data had been pervasively manipulated between at least January and April 2014,

and highly likely in 2013 as well, before the Acquisition.  After coming to realize that South

Beauty's financial condition had been misrepresented, Petitioners commenced legal proceedings

in Hong Kong and Singapore to freeze the Arbitral Respondents' assets.  On February 26 and

March 2, 2015, Petitioners were granted *ex parte* injunction orders in Hong Kong and Singapore

freezing the Arbitral Respondents' assets.  Petitioners sought those orders, which were later

served on the Arbitral Respondents, in anticipation of commencing arbitral proceedings against

the Arbitral Respondents under the SPAs, each of which contained an identical arbitration clause

requiring disputes arising out of the SPA to be submitted to CIETAC for binding arbitration.

      2.      Petitioners' Commencement of the Arbitrations and the
                 Panel's Eventual Issuance of the Partial Arbitral Awards

On March 5, 2015, Petitioners commenced the Arbitrations, one for each SPA, asserting

claims in each for, among other things, fraud and misrepresentations by the Arbitral Respondents

in connection with the Acquisition.  Over the next two and a half years, the parties participated in

vigorously contested proceedings that included voluminous documentary and testimonial

evidence and the submission of extensive expert reports.  In November 2017, the arbitral panel

held a joint, multi-week hearing on the merits in both Arbitrations, effectively consolidating the

Arbitrations insofar as they involved largely the same parties, facts and claims.  A further one-day

hearing was held in March 2018, and the arbitral panel entertained certain post-hearing matters

well into 2018.  On April 28, 2019, the panel issued the Arbitral Awards, finding in Petitioners'

favor on their misrepresentation and contract claims, dismissing the Arbitral Respondents'

counterclaims, and awarding Petitioners $142,463,666.28 in compensatory damages.

      3.      The Current Status of the Arbitrations

When it issued the Arbitral Awards, the arbitral panel also gave the parties leave to file

submissions concerning the amount and allocation of costs.  In the costs submissions, Petitioners

and the Arbitral Respondents state that they incurred costs totalling, respectively, about $15.8

million and $9.8 million.  No ruling has as yet been made on the allocation of costs.  Although the

arbitral panel was expected to rule by December 31, 2019, that date was extended in light of the

Arbitral Respondents' continued refusal to pay their share of the CIETAC and tribunal costs.

Meanwhile, on July 8, 2019, the Arbitral Respondents filed two Applications to set aside

the Arbitral Awards with the Second China International Commercial Court ("CICC"),

challenging the Arbitral Awards on procedural grounds.  On September 23, 2019, Petitioners

submitted their Statement of Defence opposing that challenge.  On March 30, 2020, a preliminary

hearing was held by video conference, following which the parties were invited to, and did,

submit post-hearing briefs.  The parties are currently waiting for the CICC to determine if a

further hearing on the Arbitral Respondents' challenge is required.

C.    The Facts Underlying the Need for the Attachment Order:  Zhang's History of
      Secreting Assets, and the Attachment of the Apartment as One of the Few Known
      Means of Ensuring that the Arbitral Awards Are Not Rendered Ineffectual

Petitioners' need for the Attachment Order is apparent.  Zhang, who was previously

identified by Forbes as one of the wealthiest persons in China, has had a long and sordid history

during the pendency of the Arbitrations of secreting, hiding and misrepresenting her assets.  As a

result, Petitioners currently know of few assets owned or controlled by Zhang that remain

available for execution to help satisfy the Arbitral Awards in the expected event that the Arbitral

Respondents' challenge of the Awards is rejected.  Those assets include Zhang's artworks at

Christie's that are now covered by the attachment order (Ex. 9) entered on November 21, 2019 in

the Christie's Attachment Proceeding, and the Apartment.  For Petitioners to have any chance of

executing on the Apartment to help enforce the Arbitral Awards, the Apartment must remain

attached to prevent Respondents from selling it and funneling the proceeds to an unknown (and

likely newly created) entity in an unknown location.

9

1.    Zhang's History of Secreting Assets to Evade the Arbitral Respondents'
   <u>All But Certain Eventual Obligation to Pay the Arbitral Awards</u>

Petitioners, while pursuing the arbitral proceedings, have also pursued extensive

injunction proceedings in Hong Kong and Singapore to probe the Arbitral Respondents' assets,

particularly Zhang's, and prevent Zhang from secreting them.  In those parallel proceedings,

Zhang was required to submit affidavits identifying her assets worldwide, and Petitioners were

able to obtain information concerning, among other assets, Zhang's bank accounts.

By comparing Zhang's affidavits with the evidence obtained in their own investigations,

Petitioners discovered numerous instances in which Zhang secreted assets in anticipation of the

prospect that she would be held liable to Petitioners in the Arbitrations.  A chronology of the

salient facts, described in detail in the Borrelli Affidavit (Ex. 8), underscores the lengths to which

Zhang has gone to evade responsibility for the Arbitral Awards.  Thus:

    i.    In connection with the Acquisition, Petitioners paid the Arbitral Respondents $286,850,887 in total between December 13, 2013 and January, 28 2014 (the "Acquisition Funds"), and the Acquisition Funds were received by the Arbitral Respondents into a Bank Safra Sarasin account owned by Zhang (the "Safra Sarasin Account").  (Borrelli Aff. ¶¶9, 40)

    ii.    On January 2, 2014, Zhang incorporated a company named Success Elegant Trading Ltd. ("SETL") in the British Virgin Islands ("BVI") using TMF (B.V.I.) Ltd. as its registered agent.  (Borrelli Aff. ¶¶26, 66)  SETL holds an account with Credit Suisse AG Singapore (the "SETL CS Account") (*Id.* at ¶¶11(d), 35-36)  Up until June 4, 2014, Zhang was the sole shareholder of SETL.  On June 4, 2014, however, Zhang transferred or gifted her sole share in SETL to Asiatrust Ltd, a professional trust company incorporated in the Cook Islands, for $1.  (Borrelli Aff. ¶¶46-47)

    iii.    Also on January 2, 2014, Metro Joy International Limited (referred to above and hereafter as "MJI Limited") and Joy Grain Group Limited ("Joy Grain") were incorporated in BVI.  (Borrelli Aff. ¶66)  Although Petitioners have been unable to obtain documentation to prove that Zhang owns or controls those two entities, both were incorporated on the same day and using the same registered agent as SETL and, as noted below, Zhang has since transferred large sums of money to each of them. Those transfers include one of $10,725,000 million to MJI Limited – which is undoubtedly affiliated with Metro Joy and serves as an additional layer of shell

companies that Zhang has erected around herself – twelve days before the Apartment was purchased in Metro Joy's name for $10,250,000.  (*Id.* at ¶¶66, 106(30)(a))[3]

iv.  In or around January 2014, Zhang transferred $90 million from the Safra Sarasin Account in Hong Kong to a UBS AG account in her name in Singapore (the "UBS Account").  (Borrelli Aff. ¶¶49, 51(a))  Zhang then further disbursed the funds in the UBS Account, including to the SETL Accounts, so that she was able to close the UBS Account in March 2014 with no balance remaining.  (*Id.* at ¶¶51(b)-(c))

v.  Between March 10, 2014 and July 21, 2014, approximately $118 million in cash and $24.7 million in securities were transferred from the Safra Sarasin Account to the SETL CS Account.  (Borrelli Aff. ¶¶42-45)  It was during that time period that Petitioners were made aware of South Beauty's underperformance and had initiated their own investigation.

vi.  According to internal emails within Bank Safra Sarasin, which Petitioners obtained in discovery, one reason why Zhang was moving money out of her Safra Sarasin account was that "her lawyer [was] helping her to ease the concern on the with-recourse term of her business sold to an [sic] PE." (Borrelli Aff. ¶42(c))

vii.  Zhang also maintained an account in the name of SETL at Deutsche Bank AG Singapore (the "SETL DB Account," and together with the SETL CS Account, the "SETL Accounts").  (Borrelli Aff. ¶¶11(d), 37)  Between March 27, 2014 and November 27, 2014, Zhang transferred $82,225,000 from the SETL CS Account to the SETL DB Account.  (*Id.* at ¶106(35))

viii.  On November 26, 2014, Zhang transferred $10,725,000 from the SETL DB Account to MJI Limited.  (Borrelli Aff. ¶¶66, 106(30.a); Ex. 14 (DB wire instruction and confirmation))  Less than two weeks later, on December 8, 2014, the Apartment was purchased in Metro Joy's name for $10,250,000.  (*See* Ex. 15 (Apt. 39A Deed)[4]

ix.  On December 15, 2014, after Metro Joy had (i) purchased the Apartment for $10.25 million using funds transferred by Zhang on November 26, 2014 and (ii) taken out a $5.125 million mortgage on the Apartment (Ex. 16 (Mortgage)), MJI Limited transferred the excess $5 million back to SETL.  (Ex. 17 (DB wire instruction and confirmation))[5]  The Deutsche Bank records for that incoming transfer and those for

[3]  Although Petitioners obtained certain of Zhang's financial records in the injunction proceedings in Hong Kong and Singapore, including those that show her transfer of $10,725,000 to MJI Limited, Petitioners have not had access to MJI Limited's financial records.  But while Petitioners do not have a record showing that those funds were transferred from MJI Limited to Metro Joy – to the extent they have separate bank accounts – during the two weeks before the purchase of the Apartment, the timeline and the overlap in the entities' names lead to no other conclusion.

[4]  Two months earlier, on September 22, 2014, Metro Joy Management, an entity incorporated in New York State on the same date and with the same address as Metro Joy, purchased apartment 21B in the same building for $3,600,000 using the same address, attorney and authorized signatory as Metro Joy later used for its purchase of the Apartment.  (*See* Ex. 12 (Apt. 21B Deed).)  There is no reason to believe that Zhang did not fund the purchase.

[5]  That Zhang's son, Wang Xiaofei, effected the transfer of $5 million back to SETL reaffirms Zhang's control over MJI Limited and Metro Joy.  Zhang installed her son as the "front person" in several of her shell companies –

the prior outgoing transfer to MJI Limited on November 26 each list an address for SETL associated with Zhang:  the record for the November 26 transfer to MJI Limited identifies SETL as having an address at one of Zhang's homes at the time (*see* Ex. 14), and the record for the December 15 transfer from MJI Limited identifies SETL as having an address associated with Cornucopiae Asset Management Limited ("Cornucopiae") in Hong Kong.  Cornucopiae is an investment firm that Zhang either owns or uses as her financial advisor, and that coordinated Zhang's payments to Christie's for the artworks that Zhang purchased in 2014 and that are now covered by the attachment order in the Christie's Attachment Proceeding.

x.   On March 2, 2015, Zhang was served with the Hong Kong injunction orders (Exs. 20-21) freezing her assets.  (Borrelli Aff. ¶¶16-18)  These orders were "continued" by separate orders issued on March 6, 2015 (Ex. 22) and April 22, 2015 (Ex. 23).  The related Singapore injunction orders were issued on March 2, 2015 and served on Zhang shortly thereafter.  (*Id.* at ¶11(c))  In the days immediately following receipt of these orders, Zhang transferred more than $35.8 million out of the SETL Accounts:

a.   On March 3, 2015, Zhang executed two separate transfers from the SETL DB Account to an HSBC Bermuda account in the name of The Manufacturers Life Insurance Company:

1.   Zhang transferred $9,902,237.00 in connection with two policies for which she was the insured.  (*See* Borrelli Aff. ¶¶69, 107; Ex. 24)  It is unclear if these policies already existed and Zhang was increasing her investment in them, or if this transfer served as her acquisition of the policies.

2.   Zhang simultaneously transferred $6,037,485 in connection with an insurance policy for her son, Wang Xiaofei.  (*Id.* at ¶¶69, 107; Ex. 25)  It is similarly unclear if this policy already existed and Zhang was increasing her investment, or if this transfer served as her acquisition of the policy.

b.   On March 4, 2015, Zhang transferred $14,878,868 from the SETL DB Account to an HSBC Bank Hong Kong account in the name of Transamerica Life (Bermuda) Ltd. in connection with an insurance policy for which she was the insured.  (*Id.*; Ex. 26)  It is unclear if this policy already existed and Zhang was increasing her investment, or if this transfer served as her acquisition of the policy.

c.   On March 4, 2015, Zhang executed additional transfers from the SETL DB Account:

1.   Zhang transferred $3 million to MJI Limited.  (*Id.* at ¶¶66, 107; Ex. 27);

2.   Zhang transferred $2,000,020 to Joy Grain (*id.*; Ex. 28); and

---

including the Metro Joy suite of companies and Apex, described below – as part of her effort to secrete her assets by putting them in names of entities or persons, like Wang, who are not parties to the Arbitrations.

      3.   Zhang transferred $13,937.50 to Asiaciti Trust Hong Kong Limited, a trust that Zhang created and to which she purportedly sold her interest in SETL in June 2014 for $1.  (*Id.* at ¶¶46-47, 107; Ex. 29)

xi.     Of the $142 million in cash and securities that was transferred from the Safra Sarasin Account to the SETL CS Account, only $22,005,981 remained as of January 31, 2016. (Borrelli Aff. ¶106(34))  Of the $82,225,000 that was transferred from the SETL CS Account to the SETL DB Account, only $33,373,585 remained as of February 29, 2016.  (*Id.* at ¶106(35))

xii.     In her affidavits in the injunction proceedings in Hong Kong and Singapore, Zhang denied having any legal or beneficial interest in SETL and the SETL Accounts even though she exercised complete control over them.  (Borrelli Aff. ¶¶46-48)

xiii.     So despite having received more than $286 million into her Safra Sarasin Account in January 2014 from the Acquisition, Zhang, in a March 13, 2015 disclosure of her assets in the Hong Kong injunction proceeding, listed only the following assets worldwide, none of which she ascribed a value to other than a single bank account:

     a.   a 2002 Nissan Jeep;

     b.   a 2010 GMC Coach;

     c.   100% ownership of Grand Lan Holdings;

     d.   two minority shareholdings in investment companies, specifically a 2.77% interest in Beijing An Run Lin Investment Management Co. and a 4.1% interest in Beijing Shu Run Yuan Investment and Management Co.;

     e.   a majority shareholding in what appears to be a holding company for the minority share in South Beauty that she maintained after the Acquisition;

     f.   a majority shareholding in a company that holds a 0.44% stake in an aquafeed manufacturing company listed in China;

     g.   her Safra Sarasin Account, which she then valued at $1.28 million;

     h.   three rooms in a business property in Beijing; and

     i.   a 69.4 square meter house in Beijing.

(*See* Borrelli Aff. ¶¶20-21; Ex. 30 at Exhibit ZL-1 (Asset Disclosure Schedule of Zhang as of March 13, 2015).)  That list of assets is certainly modest for a person who had been ranked 310th in Forbes Magazine's China Richest List 2007, with a fortune of $240 million that had reportedly increased to $330 million by 2013.  (Borrelli Aff. ¶¶22-23, 82)

xiv.     As detailed in the Borrelli Affidavit, Petitioners uncovered multiple examples of Zhang's failure to disclose all of her assets, including but not limited to the SETL

Accounts, a 600 square meter property where she lives or has lived, and highly valuable artwork and jewelry.  (Borrelli Aff. ¶¶26-89)

xv.   Throughout the Hong Kong and Singapore injunction proceedings, Zhang maintained her position that the list of assets identified in her March 13, 2015 affidavit was complete as of that date.  (Borrelli Aff. ¶¶24-25, 28-32, 46-47 and 109-117)  In light of that position and her other actions in apparent breach of court injunctions, Petitioners were forced to bring committal proceedings to hold Zhang in contempt for those actions and for her misstatements and omissions in the initial disclosure of her assets and in subsequent affidavits in which she purported to defend her position.

xvi.  Ultimately, the Hong Kong court found her explanations, at least as to certain undisclosed assets (particularly her art collection), to be "incredible" and "unbelievable," and sentenced her to a one-year imprisonment.  (Ex. 31 at pp. 40-41 (Judgment of Hong Kong High Court); Ex. 32 (Sentencing Judgment of Hong Kong High Court); Exs. 33-34 (Orders For Committal))  Warrants for her arrest have been outstanding in Hong Kong since March 2019.  (Exs. 33-34 (Warrant For Committal))

Further evidence of Zhang's ongoing scheme to secrete her and her companies' assets has emerged in the Christie's Attachment Proceeding.  Zhang successfully bid on the two artworks now covered by the attachment order in that proceeding at a May 12, 2014 auction held at Christie's.  She later funded each of the three installment payments, totaling $29.1 million, scheduled in Christie's invoice for the artworks.  Yet in an effort to shield the artworks from execution, Zhang, two weeks after purchasing them at Christie's auction, created a new entity named Apex Lead Investment Holdings Limited ("Apex").  She installed her son as the sole shareholder and director of Apex, funded the company with $1, and had Christie's alter its paperwork to put the artworks in Apex's name instead of her own.  She now contends in the Christie's Attachment Proceeding that Apex, not her or the corporate respondents, owns the artworks, rendering them immune from future execution.  Yet Apex, like Metro Joy, was then and is believed to remain today a shell company set up by Zhang to further her scheme to render her and the corporate respondents judgment proof by putting their assets in other entities' names.

The foregoing evidence reveals Zhang's brazen willingness to transfer and secrete her assets, in multiple different ways, to render herself judgment proof.  Once the Acquisition was

consummated, Zhang personally received more than $244 million of the $286 million purchase price paid by the Petitioners. Yet the steps she has since taken to shield her assets now seriously jeopardize Petitioners' ability to enforce the Arbitral Awards.

2.   Zhang's Purchase of the Apartment at the Baccarat Hotel & Residences
      in Metro Joy's Name, and Her Ownership Of or Control Over Metro Joy

The Baccarat Hotel & Residences (the "Baccarat") was constructed between 2012 and 2014 at 20 West 53rd Street in Manhattan and opened in March 2015. The building is a 50-story tower whose top 30 floors contain luxury condominiums that have been referred to as part of midtown Manhattan's "Billionaire's Row." Zhang, who had then recently received $244 million out of the $286 million paid by Petitioners in the Acquisition, purchased two of the condominiums in the Baccarat as they hit the market: the Apartment (#39A), purchased in Metro Joy's name, and another apartment (#21B) purchased in the name of Metro Joy Management.

Those purchases were part of Zhang's efforts in 2014 to conceal and secrete her assets, mainly by creating shell companies in whose names her assets were placed. Metro Joy and Metro Joy Management were two such shell companies, as confirmed by the evidence currently available to Petitioners. As noted above, on January 2, 2014, Zhang incorporated three entities in the British Virgin Islands using TMF (B.V.I.) Ltd. as the registered agent: SETL, MJI Limited and Joy Grain. (Borrelli Aff. ¶66) As detailed in the Borrelli Affidavit and in the chronology set forth above, Zhang retains ownership and control of SETL despite her contrary assertions. As to MJI Limited, the evidence shows that Zhang not only incorporated it at the same time she incorporated SETL, but she also transferred nearly $14 million to MJI Limited between November 26, 2014 and March 4, 2015. Publicly available documents further confirm Zhang's ownership of and control over not only MJI Limited, but Metro Joy and Metro Joy Management as well. The chronology, based on the documents currently available to Petitioners, is as follows:

15

i.  On March 20, 2014, Metro Joy – whose name (Metro Joy International LLC) is essentially identical to MJI Limited's (Metro Joy International Limited) – was registered as a domestic limited liability company with New York State's Department of State's Division of Corporations.  Metro Joy gave its address as Olympic Realty New York Inc., 200 W 90th Street, Apartment 2A, New York, New York 10024.  (Ex. 10 (Metro Joy's NYS DOS Record))

ii.  Also on March 20, 2014, Metro Joy Management was similarly registered as a domestic limited liability company with New York State's Department of State's Division of Corporations, and gave the same address as Metro Joy's:  Olympic Realty New York Inc., 200 W 90th Street, Apartment 2A, New York, New York 10024.  (Ex. 11 (Metro Joy Management's NYS DOS Record))

iii.  On March 21, 2014, Metro Joy Management executed a contract to purchase apartment 21B in the Baccarat from 20 West 53rd Street LLC for $3,600,000.  The purchase was completed by transfer of the deed on September 22, 2014, with Metro Joy Management providing an address at c/o Dylan Chan, Esq., 139 Center Street, #822, New York, New York 10013.  (Ex. 12 (Apt. 21B Deed))

   a.  On October 22, 2014, Metro Joy Management executed a note and mortgage for apartment 21B with Deutsche Bank.  An individual named Yue Hao executed the mortgage as an authorized signatory of Metro Joy Management, but Zhang's son, Wang Xiaofei, signed the note.  (Ex. 13)[6]

iv.  Also on March 21, 2014, Metro Joy executed a contract to purchase the Apartment from 20 West 53rd Street LLC for $10,250,000.  The purchase was completed by transfer of the deed on December 8, 2014, with Metro Joy providing an address at c/o Dylan Chan, Esq., 139 Center Street, #822, New York, New York 10013.  (Ex. 15)

   a.  On December 8, 2014, Metro Joy executed a note and mortgage for apartment 39A with Deutsche Bank.  Yue Hao executed the mortgage as an authorized signatory of Metro Joy, and Zhang's son, Wang Xiaofei, signed this note as well.  (Ex. 16)

v.  On November 26, 2014, Zhang transferred $10,725,000 from the SETL DB Account to MJI Limited.  (Ex. 14 (DB wire instruction and confirmation))  Petitioners have not, as noted, had access to the financial records of MJI Limited or Metro Joy to obtain documentary confirmation that Zhang's funds flowed through MJI Limited to Metro Joy – to the extent they operate separate bank accounts – to pay for the Apartment. But the two entities' obvious affiliation, the nearly precise match between the amount of the funds transferred and the purchase price of the Apartment, and the close proximity in time to the purchase make it all but certain that that is what happened.

vi.  On December 15, 2014, after Metro Joy had (i) purchased the Apartment for $10.25 million using the funds transferred by Zhang on November 26, 2014 and (ii) taken out

---

[6]      As noted, Zhang's son is one of the persons in whose name Zhang has put her assets as part of her scheme to make her and her companies judgment proof.  Thus, Zhang named her son as the original, and sole, shareholder and director of Apex, which now claims to own the attached artworks at Christie's.

a $5.125 million mortgage on the Apartment (Ex. 16), MJI Limited transferred the excess $5 million back to SETL.  (Ex. 17)  As noted, the Deutsche Bank records for the November 26 and December 15 transfers between SETL and MJI Limited further connect Zhang to the movement of funds by (a) identifying SETL as having addresses at Zhang's home at the time in China and at Cornucopiae, the investment firm that Zhang either owns or uses as her financial advisors and that coordinated the payments to Christie's for the artworks covered by the attachment order in the Christie's Attachment Proceeding; and by (b) providing another example of how Zhang often used her son, Wang, to front her transactions.

vii.   Zhang appears to have acquired the Apartment not as a place to live in, but rather to flip it.  According to CityRealty.com, which provides information about New York City real estate listings, from June 2016 through October 2017, the Apartment was listed for sale at asking prices ranging from $11 million to $14 million.  After being "off-market" for six months, the Apartment was again listed for sale on May 16, 2018 for $12.5 million, and has remained on the market since then, with the asking price decreasing to $11.6 million on April 21, 2019 and to $9.9 million in September 2019 (after the Arbitral Awards had been issued in Petitioners' favor on April 28, 2019).  Until the Attachment Order was entered, the Apartment was still on the market at that price, with the broker characterizing the seller as "motivated" and the opportunity to buy the Apartment a "steal."  (Ex. 18)

viii.   By early December 2019, Zhang had learned of the attachment order securing the artworks at Christie's, presumably motivating her to take steps to protect her other assets in New York.  As proof, on January 22, 2020, less than two months after Zhang learned of the Christie's Attachment Proceeding, Metro Joy Management, after owning apartment 21B for more than five years, entered into a contract to sell the apartment to an individual named Wang Yan for $3,000,000 – a loss of $600,000, but a gain of $3 million insofar as the sale proceeds are hidden and immune from future execution to help satisfy the Arbitral Awards.  (Ex. 19 (March 2020 Deed for 21B))

a.   This transaction was completed with the transfer of the deed on March 20, 2020.  Metro Joy Management provided its address as c/o Dylan Chan Law Firm, 136-20 38th Ave., Suite 11C, Flushing, NY 11354.  *Id.*

The foregoing chronology leaves little doubt that Zhang owns or controls the "Metro Joy" suite of shell companies, including Metro Joy.  It further shows that she and her agents were, until only days ago, actively trying to sell the Apartment – as they just did with apartment 21B – to further her ongoing scheme to secrete her assets.  It would ordinarily make no business sense to sell the Apartment – or any New York City residential property that need not be sold immediately – during a city-wide lockdown amidst the COVID-19 pandemic, particularly when the sale will

result in a substantial investment loss.  But a sale *does* makes sense to Zhang because the sale

proceeds that would be placed out of Petitioners' reach can be considered a financial gain to her.

Confirmation of the Attachment Order is accordingly necessary to avoid the same prejudice to

Petitioners occasioned by the sale of apartment 21B before Petitioners were aware of it.

ARGUMENT

I.   PETITIONERS ARE ENTITLED TO AN ORDER UNDER CPLR 6212(b)
     CONFIRMING THE ATTACHMENT ORDER, HAVING MET THE
     REQUIREMENTS FOR ATTACHMENT UNDER CPLR §§ 6201 AND 7502(c)

Petitioners readily meet the four elements under CPLR §§ 6201 and 7502(c), incorporated

into Fed. R. Civ. P. 64, for an order of attachment as to the Apartment and its contents.  In brief:

(i) the Arbitrations meet the cause of action requirement under CPLR 6212 and § 7502(c); (ii) the

Arbitral Awards establish that Petitioners have a likelihood of success on the merits in the

Arbitrations; (iii) Zhang's history of secreting assets confirms that, absent an order attaching the

Apartment, the Arbitral Awards will be rendered that much more ineffectual; and (iv) the Arbitral

Respondents have no counterclaims that exceed the $142,463,666.28 awarded to Petitioners.

A.   The Legal Standards Governing a Petition for Attachment

Rule 64 "dictates that state law governs the availability of the provisional remedy of

attachment in this Court."  *Mischon de Reya New York LLP v. Grail Semiconductor, Inc.*, No. 11

Civ. 04971 (RJH), 2011 WL 6957595, at *3 (S.D.N.Y. Dec. 28, 2011).  Under Rule 64(a), "[a]t

the commencement of and throughout an action, every remedy is available that, under the law of

the state where the court is located, provides for seizing a person or property to secure satisfaction

of the potential judgment."  Rule 64(b) includes attachment as one such remedy.  A "petition for

an order of attachment is, accordingly, governed by New York law."  *SiVault Sys., Inc. v.*

*Wondernet, Ltd.*, No. 05 Civ. 0890 (RWS), 2005 WL 681457, at *3 (S.D.N.Y. Mar. 28, 2005).

Under New York law, to obtain an order of attachment outside the arbitration context, "the petitioner bears the burden of demonstrating that:  (1) there is a cause of action; (2) it is probable that the petitioners in the cause of action will succeed on the merits; (3) a ground for attachment under N.Y. C.P.L.R. 6201 exists; and (4) the amount demanded from the respondent exceeds all counterclaims known to the petitioner."  *Mischon*, 2011 WL 6957595, at *3 (citing CPLR 6212(a)).[7]  CPLR § 7502(c), however, modifies that test as to an attachment sought in aid of arbitration by dictating that "the 'sole ground' upon which a court may confirm an order of attachment in aid of arbitration – essentially replacing (3) above – is that 'the award to which the applicant may be entitled may be rendered ineffectual without such provisional relief.'"  *Id.* (quoting CPLR § 7502(c)).  CPLR § 7502(c) states that CPLR § 6201, which gives the grounds for attachment generally, does not apply in determining the propriety of an attachment order in aid of arbitration.  *See* CPLR § 7502(c) ("The provisions of articles 62 and 63 of this chapter shall apply to the application . . . except that the sole ground for the granting of the remedy shall be as stated [herein] above."); *accord SiVault Sys.*, 2005 WL 681457, at n.1 (collecting cases).

In accordance with CPLR § 7502(c), state and federal courts in New York apply the "rendered ineffectual" standard in assessing attachments in aid of arbitration, rejecting the more rigorous test under CPLR § 6201 or the three-pronged test for a preliminary injunction under CPLR § 6301.[8]  Petitioners thus were, and remain, entitled to an attachment order under CPLR

---

[7]     CPLR 6212(a) states:  "On a motion for an order of attachment, or for an order to confirm an order of attachment, the plaintiff shall show, by affidavit and such other written evidence as may be submitted, that there is a cause of action, that it is probable that the plaintiffs will succeed on the merits, that one or more grounds for attachment provided in section 6201 exist, and that the amount demanded from the defendant exceeds all counterclaims known to the plaintiff."

[8]     *E.g.*, *Mischon*, 2011 WL 6957595, at *8; *SiVault Sys.*, 2005 WL 681457, at *3; *Mermaid Marine, Ltd. v. Maritime Capital Mgmt. Partners, Ltd.*, 147 A.D.3d 498, 499 (1st Dep't 2017); *Kadish v. First Midwest Sec., Inc.*, 115 A.D.3d 445, 445-46 (1st Dep't 2014); *Moquinon, Ltd. v. Gliklad*, No. 650366/2017, 55 Misc.3d 1212(A), 2017 N.Y. Slip Op. 50548(U), at *4 (Sup. Ct. N.Y. Co. Apr. 6, 2017); *Sojitz Corp. v. Prithvi Info. Solutions Ltd.*, 26 Misc.3d 670, 675 (Sup. Ct. N.Y. Co. 2009).

§ 7502(c), having shown that:  (1) Petitioners have asserted a cause of action against

Respondents; (2) Petitioners will likely succeed on the merits of the cause of action; (3) the

arbitral award in Petitioners' favor may be rendered ineffectual without an order of attachment;

and (4) the amount demanded from the Arbitral Respondents exceeds all counterclaims known to

Petitioners.  *E.g.*, *Mischon*, 2011 WL 6957595, at *3, 4-10; *see also* CPLR 6212(a).

B.      Petitioners Satisfy Each of the Requisite Elements
        of an Order of Attachment in Aid of Arbitration

        1.      The Pending Arbitrations Each Constitute a "Cause of Action"

        As noted, to obtain an order of attachment, a petitioner must first show that "there is a

cause of action."  CPLR 6212(a).  CPLR § 7502(c) states that an "arbitration shall be deemed an

action" for purpose of an application for an attachment order under CPLR Articles 62 and 75.

Here, Petitioners commenced the Arbitrations by submitting their claims against the Arbitral

Respondents to CIETAC on March 5, 2015, and the Arbitrations are still pending.  Petitioners

thus meet the "cause of action" requirement under New York law.  *E.g.*, *Mischon*, 2011 WL

6957595, at *4 (arbitration against respondent met cause of action requirement); *see also In re

Thornton & Naumes LLP*, 36 A.D.3d 1119, 1120 (3d Dep't 2007) (same).

        2.      Petitioners Are Likely to Succeed on the Merits in the
                Arbitrations, Having Already Obtained the Arbitral Awards

        Petitioners next meet the requirement under CPLR 6212(a) that they show a likelihood of

success on the merits in the Arbitrations.  "'[A]ll legitimate inferences' as to the likelihood

determination 'should be drawn in favor of the party seeking attachment.'"  *Mischon*, 2011 WL

6957595, at *4 (citing *JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs.,

Inc.,* 306 F. Supp.2d 482, 485 (S.D.N.Y. 2004)); *see also Considar, Inc. v. Redi Corp.

Establishment,* 238 A.D.2d 111, 111, 655 N.Y.S.2d 40 (1st Dep't 1997) ("Although evidentiary

facts making out a prima facie case must be shown, plaintiff must be given the benefit of all

legitimate inferences and deductions that can be made from the facts stated.").

Here, Petitioners easily meet the "likelihood of success" requirement, all the more so with

the benefit of all favorable inferences.  Petitioners have already obtained the Arbitral Awards

awarding them, on the merits, more than $142 million in compensatory damages.  Although the

Arbitral Respondents have a pending challenge to the Awards, that challenge, which Petitioners

have opposed, rests on procedural grounds and has little chance of succeeding.  Whatever its

merits, that challenge does not affect Petitioners' showing of a likelihood of success in the

Arbitrations, particularly insofar as all legitimate inferences must be drawn in Petitioners' favor.

> 3.     Zhang's History of Secreting Her and Her Companies' Assets
>        Makes It Highly Likely that the Arbitral Awards Will Be Rendered
>        All the More Ineffectual Without an Attachment of the Apartment

Petitioners next meet the third element of an attachment – that "the award to which the

applicant may be entitled may be rendered ineffectual without such provisional relief."  CPLR

§ 7502(c).  As the Second Circuit has stated, that requirement effectively asks whether the

petitioner "has need for the attachment."  *Capital Ventures Int'l v. Rep. of Arg.*, 443 F.3d 214,

221 (2d Cir. 2006).  Although a petitioner "must do more than show that attachment would be

'helpful,'" *Mischon*, 2011 WL 6957595, at *8 (citation omitted), "demonstrat[ing] the possibility,

if not the likelihood, that absent the attachment being requested, the ultimate arbitration award

would be severely compromised" will satisfy the petitioner's burden.  *County Natwest Sec. Corp.

USA v. Jesup, Josephthal & Co.*, 180 A.D.2d 468 (1st Dep't 1992) (reversing denial of

application for attachment and confirming that "sinister maneuvers or fraudulent conduct" need

not "be shown in an application under CPLR 7502(c).") (citing *Drexel Burnham Lambert v.

Ruebsamen*, 139 A.D.2d 323, 328 (1st Dep't 1988), *leave to appeal denied*, 73 N.Y.2d 703 (1988)

("the possibility that an arbitration award may be rendered ineffectual in the absence of an order of attachment is sufficient under the statute [CPLR § 7502(c)] to support provisional relief")).

Applying that standard, New York state and federal courts have consistently found that an arbitral award could be rendered ineffectual, and that an attachment was appropriate, when the petitioners have made any of multiple different showings: evidence that a respondent may become insolvent (*SiVault*, 2005 WL 681457, at *4); evidence that a respondent has stated or indicated an intention to dispose of assets that could be used to satisfy the arbitral award (*Moquinon*, 2017 N.Y. Slip Op. 50548(U), at *5; *Mischon*, 2011 WL 6957595, at *8-9; *Plenty v. Randell*, No. 95 Civ. 5850, 1995 WL 694661, at *1 (S.D.N.Y. Nov. 22, 1995)); evidence of a liquidation or transfer of assets, or that a company is a shell with no appreciable assets or with a history of failing to pay creditors (*County Natwest Sec.*, 180 A.D.2d at 468; *Habitations Ltd. v. BKL Realty Sales Corp.*, 160 A.D.2d 423 (1st Dep't 1990)); and documented allegations of fraud and a diversion of funds that could be used to help satisfy a judgment (*Sojitz*, 26 Misc.3d at 676).

Here, the facts show that, absent the attachment of the Apartment, the Arbitral Awards will be "severely compromised." The injunction proceedings in Asia revealed the lengths to which Zhang has gone to secrete her and her companies' assets to make her and them judgment proof. Zhang has secreted almost all of the more than $286 million, paid by Petitioners, that she received or had control over from the Acquisition. She claimed to have only $1.28 million in cash, but even that asset has since been dissipated to pay her legal fees and other expenses. She has lied to the Hong Kong court about her artwork collection and other assets, resulting in her being held in contempt. Most recently, in the Christie's Attachment Proceeding, Zhang has contested ownership or control over artworks at Christie's that she purchased for $29.1 million and then put in the name of a shell company, Apex, that she established two weeks later.

Zhang's dissipation of assets has left the artworks at Christie's and the Apartment as among the few known assets still available to help satisfy the Arbitral Awards. Yet even those assets, however valuable, amount to only about 25% of the Arbitral Awards plus costs and interest. Absent confirmation of the Attachment Order to secure the Apartment, Zhang will sell it and hide the proceeds so as to insulate them from execution. The Arbitral Awards will then have been severely compromised, if not rendered entirely ineffectual.

4.     The Amount Awarded in Petitioners' Favor in the Arbitral Awards Exceeds the Arbitral Respondents' Counterclaims, Which Were Dismissed in All Events

Petitioners meet the last requirement under CPLR 6212(a) – that the award to them of $142,463,666.28 in the Arbitrations exceed all counterclaims known to them – because no such counterclaims exist. Although the Arbitral Respondents had asserted counterclaims in one of the two Arbitrations, the arbitral panel dismissed the counterclaims in the first of its two Arbitral Awards. (Ex. 6) So there are no pending counterclaims, and the costs the Arbitral Respondents seek is a small percentage of the Arbitral Awards. The amount awarded to Petitioners by the Arbitral Awards accordingly far exceeds all counterclaims against Petitioners.

C.     The Apartment Is Properly Subject to Attachment

The Apartment constitutes property that may appropriately be attached to help enforce the Arbitral Awards. CPLR § 6202 states in pertinent part that "[a]ny debt or property against which a money judgment may be enforced as provided in section 5201 is subject to attachment." CPLR § 5201(b) states in pertinent part that "[a] money judgment may be enforced against any property which could be assigned or transferred . . . ." The Apartment, as a condominium unit, meets that definition of property. Zhang, through Metro Joy, purchased the Apartment in December 2014, has listed it for sale at various times over the past five years, including until just recently, and still owns or controls it. The Apartment is accordingly within Respondents' authority to assign or

23

transfer, thereby rendering it property within the meaning of CPLR § 6202 and therefore subject

to attachment in aid of the Arbitrations.

II.   PETITIONERS MEET THE REQUIREMENTS OF CPLR §§ 6211(b)
      AND 6223(b) FOR CONFIRMATION OF THE ATTACHMENT ORDER

Petitioners, having met the requirements for the Attachment Order, likewise meet the

requirements for confirming the Order.  Under CPLR § 6211(b), "the provisions of subdivision

(b) of section 6223 shall apply" to a motion to confirm, and CPLR § 6223(b) sets forth the burden

of proof that applies to such a motion.  Under CPLR § 6223, Petitioners must show "the grounds

for the attachment, the need for continuing the levy, and the probability that [Petitioners] will

succeed on the merits."  Petitioners meet each of those requirements.

First, as set forth in Section I.B, and as demonstrated by the issuance of the Attachment

Order, Petitioners have met each of the requisite elements for an order of attachment under CPLR

§ 7502(c) and have therefore established the "grounds for the attachment."  Second, as set forth in

Section I.B.3, the "need for continuing" the attachment stems from the near certainty that, absent

confirmation of the Attachment Order, the Apartment will be sold and the proceeds will be

transferred to an undisclosed location, outside New York, where Petitioners will be unable to

seize them to help enforce the Arbitral Awards.  Finally, as set forth in Section I.B.2, Petitioners

are likely to succeed on the merits in the Arbitrations, having already obtained the Arbitral

Awards awarding them, on the merits, more than $142 million in compensatory damages.

Petitioners accordingly meet the requirements for confirming the Attachment Order.

CONCLUSION

Absent confirmation of the Attachment Order to secure the Apartment and its contents, it

is all but inevitable that Zhang or her agents will sell the Apartment and transfer the sale proceeds

to an undisclosed location where they will be immune from execution.  The relief requested on

24

this motion is accordingly crucial to help avoid having the Arbitral Awards be severely compromised or rendered entirely ineffectual.  For that fundamental reason and all others given above, we respectfully submit that an order under CPLR § 6211(b) should be entered confirming the attachment of the Apartment and any of its contents owned or controlled by Respondents.

Dated:   New York, New York
        May 19, 2020

KATSKY KORINS LLP

By: /s/Steven B. Feigenbaum
     Steven B. Feigenbaum
     Timothy J. Holland
605 Third Avenue
New York, New Yok 10158
(212) 953-6000
sfeigenbaum@katskykorins.com
tholland@katskykorins.com
*Attorneys for Petitioners La Dolce Vita Fine Dining Company Limited and La Dolce Vita Fine Dining Group Holdings Limited*